```
_____
                                  )
IN RE SUBPOENA TO UNIVERSITY OF   )
NORTH CAROLINA AT CHAPEL HILL     )
                                  )
_____ )     Case No. 1:03MC138
                                  )
RECORDING INDUSTRY ASSOCIATION OF )
AMERICA                           )
                                  )
v.                                )
                                  )
UNIVERSITY OF NORTH CAROLINA AT   )
CHAPEL HILL                       )
                                  )
_____ )
                                  )
IN RE SUBPOENA TO NORTH CAROLINA  )
STATE UNIVERSITY                  )
                                  )
_____ )     Case No. 1:03MC139
                                  )
RECORDING INDUSTRY ASSOCIATION OF )
AMERICA                           )
                                  )
v.                                )
                                  )
NORTH CAROLINA STATE UNIVERSITY   )
                                  )
_____ )
```

## O R D E R

### Background

These cases, which are consolidated only for the purposes of
this Order, involve attempts by the Recording Industry
Association of America (the RIAA) to identify two internet users
which it believes infringed the copyrights of its members.  The
RIAA states that it has information indicating that unknown
persons using the screen names "hulk" and
"CadillacMan@Blubster.com" offered to download to other users a
number of computer files containing songs.  The RIAA claims that

its members own the copyrights for these songs and that the downloads constitute an infringement of those copyrights.

When copyright owners or their representatives learn of a person engaging in infringing activity, they can simply contact the person directly to stop the infringement or else bring a lawsuit to achieve that same result. However, because the alleged infringers in the present cases identify themselves on the internet only by their screen names, the RIAA has been unable to use ordinary means to identify and contact them. Still, the RIAA was able to ascertain that "hulk" receives access to the internet through the University of North Carolina at Chapel Hill (UNC) and that "CadillacMan" receives internet service through North Carolina State University (N.C. State). As their internet service providers (ISPs), UNC and N.C. State should be aware of "hulk" and "CadillacMan's" true identities. For this reason, the RIAA obtained subpoenas from the Clerk of this Court directed to the schools pursuant to the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512. The subpoenas and their attachments identify copyright violations that the RIAA claims "hulk" and "CadillacMan" committed and seek to compel the schools to provide it with the alleged infringers' actual names, addresses, telephone numbers, and e-mail addresses.

Initially, the schools did not object to the subpoenas and appeared willing to comply. However, they first notified the users that the subpoenas had been issued. After receiving notification, and before the schools complied with the subpoenas,

-2-

"hulk" filed both a motion to intervene as "John Doe" ("hulk" will hereafter be referred to as "John Doe") and a motion to quash the subpoena. "CadillacMan" also filed a motion to quash, a motion for a protective order, and later a motion to intervene as "Jane Doe" ("CadillacMan" will hereafter be referred to as "Jane Doe"). (She later filed an amended motion to quash.) The motions to intervene were subsequently granted and briefing continued on the other motions. The briefing was later joined by various <u>amici</u> <u>curiae</u>, including the Electronic Privacy Information Center and IP Justice which support the motions to quash, and various entertainment organizations which oppose the motions. Thereafter, and based on an opinion issued by the Court of Appeals for the District of Columbia Circuit,[1] UNC and N.C. State became uncertain of the lawfulness of the subpoenas and filed their own motions to quash. Finally, because the constitutionality and applicability of the DMCA are being challenged, the United States has now intervened in both cases to defend the statute. All motions have now been briefed by any interested parties and are now before the Court for decisions.

### The Digital Millennium Copyright Act

The various arguments raised by the interested parties cannot be placed into context without an initial discussion of

---

[1]<u>Recording Industry Ass'n of America, Inc. v. Verizon Internet Services, Inc.</u>, 351 F.3d 1229 (D.C. Cir. 2003), <u>cert</u> <u>denied</u>, ____ U.S. ____, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004), <u>and cert</u>. denied <u>sub nom</u>, <u>Verizon Internet Services, Inc. v. Recording Industry Ass'n of America, Inc.</u>, ____ U.S. ____, 125 S.Ct. 347, 160 L.Ed.2d 222 (2004).

the DMCA and, in particular, the sections which give rise to their disagreements. The DMCA was enacted in 1998 and, with respect to the part with which this Court is concerned, it was an effort by Congress,

> to resolve the unique copyright enforcement problems caused by the widespread use of the Internet. See Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004); In re Aimster Copyright Litigation, 334 F.3d 643, 655 (7th Cir. 2003); DMCA, Pub.L. No. 105-304, 112 Stat. 2860 (1998). Tackling copyright infringement on the Internet required balancing the competing interests of several groups. The first set of competing interests includes those of copyright holders and end users. The DMCA "intended to 'balance the need for rapid response to potential infringement with the end-users [sic] legitimate interests in not having material removed without recourse.'" Rossi v. Motion Picture Assoc. of America, 391 F.3d 1000, 1003 (9th Cir. 2004) (quoting S.Rep. No. 105-190, at 21 (1998) (alterations in original)). The second set of competing interests were those of copyright holders and ISPs whose services may be used to infringe copyrights. The DMCA intended to balance the interests of these parties by creating a mechanism for rights holders to inform ISPs of potentially infringing conduct while, at the same time, providing "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." Ellison, 357 F.3d at 1076 (quoting S.Rep. No. 105-190, at 20 (1998); H.R.Rep. No. 105-551, pt. 2, at 49 (1998)).

Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004).

The compromise, as enacted in the DMCA, both preserves copyright enforcement on the internet and provides

> immunity to service providers from copyright infringement liability for "passive," "automatic" actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider. H.R. Conf. Rep. No. 105-796, at 72 (1998), reprinted in 1998 U.S.C.C.A.N. 649; H.R.Rep. No. 105-551(I), at 11

(1998). This immunity, however, is not presumptive, but granted only to "innocent" service providers who can prove they do not have actual or constructive knowledge of the infringement, as defined under any of the three prongs of 17 U.S.C. §§ 512(c)(1). The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, i.e., at the moment it becomes aware that a third party is using its system to infringe. At that point, the Act shifts responsibility to the service provider to disable the infringing matter, "preserv[ing] the strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." H.R. Conf. Rep. No. 105-796, at 72 (1998), reprinted in 1998 U.S.C.C.A.N. 649.

ALS Scan, Inc. v. RemarQ Communities, Inc., 239 F.3d 619, 625

(4th Cir. 2001).

As noted by the court in Corbis, 351 F. Supp. 2d at 1098-

1099:

> This balancing effort resulted in a statute that creates "'strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital network environment.'" Rossi, 391 F.3d at 1003 (quoting H.R.Rep. No. 105-551, pt. 2, at 49 (1998)). For instance, a copyright owner who suspects that her copyright is being infringed "must follow the notice and take down provisions set forth in §§ 512(c)(3) of the DMCA." Id. at 1003. Once properly notified, a service provider must "respond[ ] expeditiously to remove, or disable access to, the material that is claimed to be infringing." Recording Industry Ass'n of America v. Verizon Internet Servs., 351 F.3d 1229, 1234 (D.C. Cir. 2003). If a service provider fails to take down the potentially infringing material, it exposes itself to copyright liability.

> In addition to these notice and take down provisions, the DMCA also establishes several "safe harbors" that protect certain common activities of ISPs. See S.Rep. No. 105-190, at 19; H.R.Rep. No. 105-

-5-

551, pt. 2, at 41- 42. The DMCA safe harbors do not
render a service provider immune from copyright
infringement. <u>See</u> <u>Ellison</u>, 357 F.3d at 1077. They do,
however, protect eligible service providers from all
monetary and most equitable relief that may arise from
copyright liability. <u>See</u> <u>id</u>.; 17 U.S.C. §§ 512(a)-(d),
(j). Thus, even if a plaintiff can show that a safe
harbor-eligible service provider has violated her
copyright, the plaintiff will only be entitled to the
limited injunctive relief set forth in 17 U.S.C. §§
512(j). <u>See</u> 17 U.S.C. §§§§ 512(a)-(d), (j); <u>Verizon</u>
<u>Internet Servs.</u>, 351 F.3d at 1234.

The "safe harbor" provisions of Sections 512(a)-(d) give
limited protection from copyright liability to four types of
"service providers."[2] Subsection (a) addresses transitory
digital network communications or service providers who simply
allow information to pass through their systems from one user of
the service to another person; (b) covers system caching or
providers that temporarily store data from one user before
passing it on to another person at the request of the user; (c)
deals with providers that allow users to store data on the
provider's system or network for longer periods of time; and (d)

---

[2]Service providers are defined in subsection (k) of the statute. Subsection
(k)(1)(A) states that a "service provider" as used in Section 512(a) is an
"entity offering the transmission, routing, or providing of connections for
digital online communications, between or among points specified by a user, of
material of the user's choosing, without modification to the content of the
material as sent or received." Subsection (k)(1)(B) defines "service provider"
as used in any subsection other than Section 512(a) as "a provider of online
services or network access, or the operator of facilities therefor, <u>and</u> <u>includes</u>
<u>an</u> <u>entity</u> <u>described</u> <u>in</u> <u>subparagraph</u> <u>(A)</u>." (emphasis added)

It is of more than passing interest that Congress thought it necessary to
provide a separate definition to cover Section 512(a) service providers. As will
be seen in conjunction with the discussion of the subpoena provisions of Section
512(h), Congress created a subpoena mechanism that, on its face, does not seem
to apply to Section 512(a) providers. The distinctions made in Section 512(k)
gives reason to conclude that the different treatment of Section 512(a) providers
in Section 512(h) was intentional.

speaks to providers that maintain data on their network or system for use with an information location tool or service. Id. Upon compliance with various requirements set out in their respective portions of the statute, all four types of providers may gain immunity from liability for copyright infringing information that passes through or is stored on their networks or systems by users.

Only one of the requirements which the providers must meet in order to avoid liability is relevant to these cases. It only applies to three of the four different types of providers, but it is of critical importance. As explained above, providers discussed in subsections (b), (c), and (d) all engage in some form of information storage. These three subsections all contain a requirement that the providers respond to a written notification described in subsection (c)(3).[3] The subsection (c)(3) notification, among other things, must be "reasonably sufficient to permit the provider to locate the material" so that the provider can remove or disable access to infringing information stored on the providers' systems. 17 U.S.C. § 512(c)(3)(A)(iii). The notification in subsection (c)(3) presumes that the information is stored on a provider's system. In order to be effective, the notification must include "substantially" the following items: (1) a signature of the representative of the copyright owner, (2) identification of the

---

[3]Both Sections 512(b) and 512(d) may require slight modification to the subsection (c)(3) notification. Sections 512(b)(2)(E) and 512(d)(3).

works infringed or a representative list of the works, (3) identification "of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled and information reasonably sufficient to permit the service provider to locate the material," (4) contact information for the complaining party, (5) a statement that the complaining party has a good faith belief that use of copyrighted material in the manner described is unauthorized and unlawful, and (6) a statement that the notification is accurate and a statement under penalty of perjury that the complaining party is authorized to act on behalf of the owner of the copyright. 17 U.S.C. § 512(c)(3)(A).

Some problems have arisen because of changing technology. As noted by the Eighth Circuit in In re Charter Communications, Inc., Subpoena Enforcement Matter, 393 F.3d 771 (8th Cir. 2005), during the 1980's, internet users posted copyrighted works on electronic bulletin boards so that individual users could download the works to their own computers. However, developing technology allowed individuals to directly locate and obtain files of copyrighted works stored on another person's computer. These systems are called peer-to-peer ("P2P") systems. Early P2P relied on a centralized filing system, but now,

> the new generation of P2P file sharing programs allow
> an internet user to access the files located on other
> computers through the internet. By utilizing the new
> technology, an internet user can search directly the
> MP3 file libraries of other users, with no web site
> being involved because the transferred files are not

-8-

> stored on the computers of the ISP providing the peer-to-peer users with internet access. [citations omitted]

Charter, 393 F.3d at 773.

As a consequence of the new technology, litigation initiated by copyright holders now targets individuals, as opposed to internet service providers or bulletin board operators. Id. In order to pursue such alleged infringers, the RIAA must be able to identify the individuals who may be sharing or trading P2P programs. This can be done by obtaining the internet protocol ("IP") address for a particular screen name, which then can be used to trace the user to the ISP. Recording Industry Ass'n of America, Inc. v. Verizon Internet Services, Inc., 351 F.3d 1229, 1232 (D.C. Cir. 2003), cert denied, ____ U.S. ____, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004), and cert. denied sub nom, Verizon Internet Services, Inc. v. Recording Industry Ass'n of America, Inc., ____ U.S. ____, 125 S.Ct. 347, 160 L.Ed.2d 222 (2004). However, "[o]nly the ISP . . . can link the IP address used to access a P2P program with the name and address of a person - the ISP's customer - who can then be contacted or, if need be, sued by the RIAA." Id.

In order to identify the person who allegedly shared or offered to share copyright works, whether stored on an ISP computer or when P2P programs are used, the RIAA seeks to use the subpoena provisions of the DMCA in Section 512(h). That section provides that the copyright owners and their agents "may request the clerk of any United States district court to issue a subpoena

-9-

to a service provider for identification of an alleged infringer in accordance with this subsection." 17 U.S.C. § 512(h)(1). It further states that such a subpoena may be requested by filing: (1) a copy of a subsection (c)(3)(A) notification, (2) the proposed subpoena, and (3) a sworn declaration that the purpose of the subpoena is only to obtain the alleged infringer's identity and that the information will only be used to protect rights under the Act. 17 U.S.C. § 512(h)(2). The subpoena itself authorizes and orders the service provider to "expeditiously" disclose to the copyright owner the information which identifies the alleged infringer described in the subsection (c)(3)(A) notice. 17 U.S.C. § 512(h)(3). If its form is proper, the subpoena is to be issued by the clerk and complied with "expeditiously" by the service provider "notwithstanding any other provision of law . . . ." 17 U.S.C. § 512(h)(4)&(5). The RIAA used Section 512(h) to obtain the subpoenas in the present cases.

## Discussion and Analysis

The main attack on the RIAA's subpoenas comes from both of the Does' motions to quash. They raise statutory, constitutional, and procedural arguments in favor of quashing the subpoenas. Because the statutory and procedural attacks will dispose of these two matters, the Court will start with them.

The statutory construction argument essentially boils down to a contention that Congress intended the subpoena provision in subsection (h) of the DMCA to apply only to service providers

-10-

described in subsections (b), (c), and (d), but not to service providers in subsection (a). Because UNC may only be a Section 512(a) service provider, at least with regard to the allegedly infringing material in his case,[4] John Doe concludes that the subpoena to UNC was not authorized. A similar argument was rejected by the lower court in In re: Verizon Internet Services, Inc., 240 F. Supp. 2d 24 (D.D.C. 2003), but prevailed on appeal in Recording Industry, 351 F.3d 1229. The Eighth Circuit has followed the D.C. Circuit with one judge dissenting. Charter, 393 F.3d 771.

In determining whether the subpoenas in this case were authorized by the DMCA, the Court begins by looking at the language of the statute itself in order to determine whether its meaning is plain and unambiguous. Holland v. Big River Minerals Corp., 181 F.3d 597, 603 (4th Cir. 1999), cert, denied, 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000). In making this determination, the Court should be guided by the context surrounding the language in question, along with the broader context of the statute as a whole. Id. If, after this review, the Court finds the statutory language in question to be ambiguous, it may look to the legislative history to determine

---

[4]UNC and N.C. State contend that they are only conduit providers and, thus, fall within the provisions of 17 U.S.C. §§ 512(a). However, they admit that they allow their students to construct a web page and, thus, use the schools' storage facilities. This could make the schools a storage provider under subsection (c) if the allegedly infringing works were stored there. There has not been any allegation to this effect, so for purposes of this case, the Court accepts the Universities' contentions.

Congressional intent and, if that is not apparent, then it may apply the traditional tools of statutory construction.  <u>Id</u>.

The statutory provision in question is 17 U.S.C. § 512(h), the title of which identifies the purpose of the statute to be to identify an alleged infringer.[5]  Although the subsection concerns

---

[5] 17 U.S.C. § 512(h) reads as follows:

**(h) Subpoena to identify infringer.**--

**(1) Request.**--A copyright owner or a person authorized to act on the owner's behalf may request the clerk of any United States district court to issue a subpoena to a service provider for identification of an alleged infringer in accordance with this subsection.

**(2) Contents of request.**--The request may be made by filing with the clerk-

    **(A)** a copy of a notification described in subsection (c)(3)(A);

    **(B)** a proposed subpoena; and

    **(C)** a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title.

**(3) Contents of subpoena.**--The subpoena shall authorize and order the service provider receiving the notification and the subpoena to expeditiously disclose to the copyright owner or person authorized by the copyright owner information sufficient to identify the alleged infringer of the material described in the notification to the extent such information is available to the service provider.

**(4) Basis for granting subpoena.**--If the notification filed satisfies the provisions of subsection (c)(3)(A), the proposed subpoena is in proper form, and the accompanying declaration is properly executed, the clerk shall expeditiously issue and sign the proposed subpoena and return it to the requester for delivery to the service provider.

**(5) Actions of service provider receiving subpoena.**--Upon receipt of the issued subpoena, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), the service provider shall expeditiously disclose to the copyright owner or person authorized by the copyright owner the information required by the subpoena, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.

**(6) Rules applicable to subpoena.**--Unless otherwise provided by this

itself with obtaining a subpoena to identify an infringer, Congress for some reason included in that process the notification provisions of 17 U.S.C. § 512(c)(3)(A). The notification process has its origin in and only relates to the three safe harbor provisions of Sections 512(b)-(d). Upon receiving a subsection (c)(3)(A) notification, those three types of service providers only obtain protection from copyright infringement liability by removing the infringing material or disabling access to it. The statute is so written that in making a request to the court for a subpoena, the requestor must not only submit a proposed subpoena, but a copy of the notification.

As noted previously, the notification, among other things, requires the copyright holder to identify the alleged works which have been infringed and to identify the material which is claimed to be infringing. Section 512(c)(3)(A)(ii)&(iii). It contains information which allows the service provider to contact the complaining party, verification statements that the allegedly infringing material is not authorized by the copyright owner or the law, and that the complaining party is authorized to act on behalf of the owner or right holder. 17 U.S.C. § 512(c)(3)(A)(iv)-(vi). Therefore, there is no doubt that the notification document contains valuable and necessary information

---

section or by applicable rules of the court, the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum.

in order for a subpoena to be issued. Without the contents of the notification, there would not be a basis for the subpoena, except for a conclusory allegation that the subpoena is sought to obtain the identity of an alleged infringer. 17 U.S.C. § 512(h)(2)(C). Thus, notification information is a crucial part of the subpoena process.

The problem in this case arises because the RIAA has chosen to serve a subpoena on a Section 512(a) service provider. This type of provider supplies transitory digital communication and is not subject to the subsection (c)(3) notice provisions. Such a provider does nothing more than transmit, route, or provide a connection, and act as a conduit for the transmission of the copyrighted material. There is no stored material to remove or access to disable. Yet, as seen from the above discussion of Section 512(h), that subsection requires that a (c)(3) notification notice accompany the subpoena application. The Does say this clearly shows that Congress did not intend to allow the subpoenaing of Section 512(a) service providers. The RIAA, on the other hand, requests the Court to look beyond the words of the statute, to Congressional intent. According to the RIAA, the intent of Congress to curtail internet copyright violations means that Congress also intended that the subpoena provisions of Section 512(h) were meant to apply to Section 512(a) providers as well. Therefore, according to the RIAA, even though a (c)(3) notification is not sent to a Section 512(a) provider, subsection

-14-

(h)(2)(A) is satisfied by supplying the substantial equivalent of the information contained in a notification.

Under the RIAA's view, the drafting of the subpoena provisions of the DMCA was, at best, unartful. Even so, the question remains as to whether the imprecision was inexact to the extent of being ineffective for purposes of bringing Section 512(a) service providers within the coverage of Section 512(h).

Two courts of appeals have concluded the subpoena provisions do not apply to Section 512(a) service providers. The District of Columbia was first. <u>Recording Industry</u>, 351 F.3d 1229. It held that Section 512(h) does not apply to Section 512(a) service providers, but rather "is structurally linked to the storage functions of an ISP and not to its transmission functions, such as those listed in § 512(a)." <u>Id</u>. at 1237. In coming to this conclusion, the court found that the subpoena provisions of the DMCA also apply to Sections 512(b)&(d) service providers. It did this even though Section 512(h) explicitly requires the "notification described in § 512(c)(3)(A)" [§ 512(h)(2)(A)]. It reasoned that because a removal or access disabling notification could be given to these other two service providers, one could readily assume that Congress intended the subpoena provisions of Section 512(h) to be applied to them as well. <u>Id</u>. at 1237. As noted above, these two providers receive a subsection (c)(3)(A) notification with slight variations. <u>See</u> n.3, <u>supra</u>.

Having concluded that the explicit provisions of Section 512(h) did not authorize the issuance of a subpoena to mere

-15-

transmitting service providers, the D.C. Circuit found no need to examine legislative history.  In any event, it found that history showed that P2P data exchange was not contemplated at the time the statute was written and, therefore, the court concluded that it would not be proper for a court to rewrite the DMCA in order to have it "fit a new and unforeseen internet architecture."  Id. at 1238.

The Eighth Circuit in Charter, 393 F.3d 771, agreed with this interpretation of the subpoena provisions of the DMCA.  The dissent in Charter would read Section 512(h)(2)(A), which requires a copy of the notification described in subsection (c)(3)(A), to merely "indicate the kind of information which needs to be given to the clerk to request a subpoena."  Id. at 781.  The dissent's conclusion was based on the undeniable fact that the "intent of Congress in enacting the DMCA was to address 'massive piracy' of copyrighted works over digital networks without hampering technological development of the internet by the threat of third party liability for service providers.  Sen. Rep. 105-190, at 8 (1998)."  Id. at 782.  Further, it found the purpose of the subpoena power was to obtain the assistance of service providers to obtain identification information in order to quickly act on copyright violations.  Thus, the dissent in Charter would read Section 512(h) as allowing the issuance of a subpoena against a Section 512(a) service provider so long as all of the information required by the notification provisions of Section 512(c)(A) were included, even though there would be no

information provided "reasonably sufficient to permit the service provider to locate the material" to be removed or access disabled.  Section 512(c)(3)(A)(iii).

This Congressional intent was not lost on the D.C. or Eighth Circuits, both of which allowed for the definition of notification in Section 512(h)(2)(A) to include Section 512(b)&(d) providers, whereas a narrow reading would have found that only Section 512(c) providers were covered.  <u>Recording Industry</u>, 351 F.3d at 1238.  Their holdings accommodate the principle of statutory construction that a statute should be construed in light of its purpose, and with respect to remedial legislation such as the DMCA:

> It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." <u>Davis v. Michigan Dept. of Treasury</u>, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," <u>Gustafson v. Alloyd Co.</u>, 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), and "fit, if possible, all parts into an harmonious whole," <u>FTC v. Mandel Brothers, Inc.</u>, 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959).

<u>Food and Drug Admin. v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

In looking at the statute's core objectives, the District of Columbia Court necessarily found the objective of the DMCA subpoena provisions concerned the storage functions of an ISP and not the transmission functions.  The RIAA would argue that this scope is too narrow and that the Court should look to the larger

-17-

concern of copyright violations arising as a result of internet activity.

While the RIAA's argument at first blush is tempting, the Court rejects it because it would necessarily amount to the re-writing of the statute. A court is only authorized "to apply the provision as written, not as we would write it." <u>See</u>, <u>e.g.</u>, <u>Badaracco v. Commissioner of Internal Revenue</u>, 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984); <u>United States v. Demerritt</u>, 196 F.3d 138, 143 (2d Cir. 1999). It may not "improve," insert "additional, material terms," eliminate "incongruity," or alter "imprecise enactments." <u>Wright v. Secretary for Dept. of Corrections</u>, 278 F.3d 1245, 1255 (11th Cir.), <u>cert</u>. <u>denied</u> <u>sub nom</u>, <u>Wright v. Crosby</u>, 538 U.S. 906, 123 S.Ct. 1511, 155 L.Ed.2d 225 (2003); <u>Texaco Inc. v. Duhe</u>, 274 F.3d 911, 920 (5th Cir. 2001); <u>United States v. Pacheco</u>, 225 F.3d 148, 155 (2d Cir. 2000), <u>cert</u>. <u>denied</u>, 533 U.S. 904, 121 S.Ct. 2246, 150 L.Ed.2d 234 (2001); <u>Lanier v. District of Columbia</u>, 871 F. Supp. 20, 23 (D.D.C. 1994).

> Another iteration of the same point colorfully states that: Congress has put down its pen, and we can neither rewrite Congress' words nor call it back to "cancel half a line." Our task is to interpret what Congress has said . . . . <u>Director, Officer of Workers' Compensation Programs v. Rasmussen</u>, 440 U.S. 29, 47, 99 S.Ct. 903, 59 L.Ed.2d 122 (1979).

<u>Williams v. United States</u>, 240 F.3d 1019, 1037 (Fed. Cir. 2001).

At least with respect to Sections 512(b)&(d) service providers, there are notification provisions applicable to them. Therefore, allowing the fine tuning of the notification

-18-

requirement contained in Section 512(h) to accommodate subsection (b)&(d) providers does not require the wholesale insertion of a non-existent notice provision, which would be necessary to include Section 512(a) providers. It is a distinction amounting to a difference in kind, as opposed to degree. In order to include Section 512(a) providers within Section 512(h), the Court would be required to craft rules to allow for the substitution of "important" information in place of the subsection (c)(3)(A) notification. This rewriting of Section 512(h)(2)(A) would be particularly awkward, because other provisions of Section 512(h) explicitly reference and rely on the notification. In fact, the "Basis for granting subpoena," which is the title of Section 512(h)(4), requires the clerk to find that the notification satisfies the provision of subsection (c)(3)(A). The RIAA would now have the clerk interpret the statute so as to define what information is important for a Section 512(a) provider. The change in the statute would amount to a quantum leap, not a mere deviation in orbit, and would create, in essence, a new substance from that which existed before.

Second, having the clerk make such an interpretation creates more problems than it solves. As mentioned earlier, the Does claim that Section 512(h) violates Article III of the United States Constitution by allowing the exercise of judicial power by the clerk of court and also in absence of an actual case or controversy. While the Court need not get into that matter at this time, the Eighth Circuit commented that "this provision <u>may</u>

-19-

unconstitutionally invade the power of the judiciary by creating a statutory framework pursuant to which Congress, via statute, compels a clerk of court to issue a subpoena, thereby invoking the court's power." <u>Charter</u>, 393 F.3d at 777-778.[6]

As part of its defense of Section 512(h), the RIAA relies on that part of the lower court's decision in <u>Verizon</u>[7] where the court found a clerk's issuing a Section 512(h) subpoena did not constitute an act of judicial or discretionary power in violation of Article III. It argues that the clerk merely performs a

---

[6]The RIAA and the United States point to a number of statutes which allow for the issuance of subpoenas or similar orders when no action is pending before an Article III court. These statutes include 2 U.S.C. § 388 (private party can get witness subpoena from a clerk or judge for a contested election hearing), 7 U.S.C. § 2354(a)(clerk can issue subpoenas at request of parties for hearings in the Plant Variety Protection Office), 28 U.S.C. § 1782(a)(private party can get court order compelling testimony or document production for a current or anticipated foreign proceeding), 29 U.S.C. § 161(1)(National Labor Relations Board can issue judicially enforceable subpoenas), 29 U.S.C. § 657(b)(same for Occupational Safety and Health Association), 35 U.S.C. § 24(clerk can issue subpoena at party's request in a contested case in the Patent and Trademark Office), and 45 U.S.C. § 157(h)(clerk may issue subpoenas at the request of arbitrators in Railway Labor Act disputes). They also point to Fed. R. Civ. P. 27 and 28 U.S.C. § 1782(a) which authorize prefiling discovery and discovery in foreign litigation.
    There are significant differences between those situations and the issuance of the subpoenas in the present cases which are sought by private parties for their own private purposes, without any subsequent supervision. First and foremost, several of the statutes involve requests for subpoenas made by the government for the purposes of government investigations or hearings. Others allow requests for subpoenas by private parties, but such requests are made in conjunction with contested, quasi-judicial government hearings. And for Fed. R. Civ. P. 27 and 28 U.S.C. § 1782, there is direct judicial or other supervision which may determine whether a case or controversy exists prior to and after issuance.

[7]<u>In Re Verizon Internet Services, Inc.</u>, 257 F. Supp. 2d 244, 249 (D.D.C. 2003), <u>reversed</u> <u>sub</u> <u>nom</u>, <u>Recording Industry Ass'n of America, Inc. v. Verizon Internet Services, Inc.</u>, 351 F.3d 1229 (D.C. Cir. 2003), <u>cert</u> <u>denied</u>, ____ U.S. ____, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004), <u>and</u> <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom</u>, <u>Verizon Internet Services, Inc. v. Recording Industry Ass'n of America, Inc.</u>, ____ U.S. ____, 125 S.Ct. 347, 160 L.Ed.2d 222 (2004).

ministerial duty. Whether this is so with respect to subpoenas issued to Section 512(b)-(d) service providers may be debatable, but it is not the case for Section 512(a) providers. Because Section 512(h) is ambiguous, it inescapably follows that the clerk must perform more than a ministerial act were he or she to issue a subpoena against a Section 512(a) provider. The clerk would have to make an independent judgment that an application was both authorized by the DMCA and that it was in substantial compliance by the supplying of information Congress would have intended to be placed on file before a subpoena is issued, assuming that Congress had such an intention. This hardly looks like a ministerial duty and the conundrum supplies another compelling reason to not attempt to do a judicial re-write of the statute.

Furthermore, in Section 512(h)(5), Congress stated that after the service provider received the subpoena, "either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A)," the service provider has to disclose the identification information. Once again, Congress explicitly tied the subpoena power to receipt of a notification which arguably applies to Sections 512(b)&(d) service providers, but clearly does not apply to Section 512(a) service providers. The drafters of the legislation, in providing for a subpoena power, again focused on notification which simply does not apply to a Section 512(a) service provider.

-21-

It seems clear that Congress enacted the subpoena provisions of Section 512(h) to supply identification information to copyright owners in order to stem the flow of copyright violations. It is possible, as the RIAA argues, that Congress would have wished that such subpoenas be issued to Section 512(a) providers. It is equally clear, however, that for whatever reason, the drafters of Section 512(h) crafted a mechanism which focuses on the notification provisions of the Act which only apply to Sections 512(b)-(d) service providers. Whether this was an intentional act, an oversight, or an unforeseen event, the undue focus on notification in Section 512(h) compels the Court to give the notification requirement the importance given to it in the Act. The quagmire created by involving the clerk of court in the process further muddies the water. A construction of the DMCA to allow subpoenas on Section 512(a) service providers would amount to a re-writing of the DMCA, as opposed to a mere construction of ambiguous terms. There are simply too many dangling threads in this cloth for a court to tailor it into a garment fit for the use that RIAA proposes.

### The N.C. State Subpoena

Jane Doe has a separate argument for showing that the subpoena is improper as issued against her. She raises a question of venue and improper service. N.C. State, the internet service provider targeted by the subpoena in her case, is located in the Eastern District of North Carolina, rather than in this District. She argues that venue for the subpoena is controlled

-22-

by 28 U.S.C. § 1391, which defines venue to be any district where all defendants in a case reside or where a substantial part of the claims in the case arose. She points out that N.C. State is located in the Eastern District of North Carolina, and the alleged acts of infringement occurred outside of this District as well. N.C. State has not objected to the subpoena on that basis. The RIAA contends that Section 1391 applies to civil actions, not subpoenas, and moreover, Section 512(h) allows them to seek a subpoena in any court in the nation for service in any other district. Because of the RIAA's extraordinary position which could affect other Section 512(h) subpoenas issued by the clerk without judicial review, the Court deems it best to address this issue.

Section 512(h)(1) states that a copyright owner or the agent "may request <u>the</u> <u>clerk</u> <u>of</u> <u>any</u> <u>United</u> <u>States</u> <u>district</u> <u>court</u> to issue a subpoena." (emphasis added) The RIAA contends this allows nationwide service of process. In the alternative, it says that the Act allows service pursuant to the 100 mile rule contained in Fed. R. Civ. P. 45(b)(2). This is based on Section 512(h)(6), which states that unless otherwise provided, the court should look to the provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena <u>duces</u> <u>tecum</u>. Raleigh, North Carolina, is within 100 miles of the border of this District.

The Court has already alluded to questions concerning the constitutionality of Section 512(h). The RIAA's suggested

construction of the issuance and service provisions of Section 512(h) throws another log onto the fire lapping at Section 512(h). According to it, a copyright owner could obtain a subpoena in Oregon in order to serve a North Carolina service provider. Should the resulting service provider wish to contest the subpoena, it would have to travel to Oregon. Imposing such burden invites questions concerning whether the statute violates due process.

With the advent of federal nationwide service of process statutes has come a greater recognition that an assertion of jurisdiction over persons on that basis must comport with the Due Process Clause of the Fifth Amendment. Esab Group, Inc. v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997), cert. denied, 523 U.S. 1048, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998); In re Automotive Refinishing Paint Antitrust Litigation, 358 F.3d 288, 298 (3d Cir. 2004). Some courts would find that due process is satisfied so long as the individual has minimum contacts with any place within the United States, but others would require more. Medical Mut. of Ohio v. deSoto, 245 F.3d 561, 568 n.4 (6th Cir. 2001)(collecting cases). The Fourth Circuit, in particular, finds that due process protects an individual's liberty interests against unfair burden and inconvenience. It has noted that federal venue statutes provide the primary protection against undue burden and that it likely would require an unusual case for a constitutional violation to arise. Esab Group, 126 F.3d at 627; see also Peay v. BellSouth Medical Assistance Plan, 205 F.3d

-24-

1206, 1212 (10th Cir. 2000).  However, in the present situation, because no case has been filed, there are no fallback venue statutes to ease the burden.

The RIAA never explains why it has a need to go to a court in a district where the service provider is not, in order to obtain a subpoena.  However, the temptation to abuse the power is amply demonstrated in this case.  Jane Doe shows that the RIAA originally attempted to have the District of Columbia district court issue the subpoena.

Before examining the constitutionality of the purported nationwide service of process provisions of Section 512(h), it will be better to follow the Supreme Court's path in <u>Stafford v. Briggs</u>, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980).  There, plaintiffs sought to employ the nationwide venue provisions of 28 U.S.C. § 1391(e) against government officials sued for damages in their individual capacity.  Rather than wading into the due process problems, the Supreme Court resolved the matter on the basis of statutory construction.  <u>See</u> <u>Stafford</u>, 444 U.S. at 553 (Stewart, J., dissent).

To start, one must distinguish nationwide service of process from both jurisdiction and venue.  <u>Id</u>.  <u>See</u> <u>Willingway Hosp. Inc. v. Blue Cross & Blue Shield of Ohio</u>, 870 F. Supp. 1102 (S.D. Ga. 1994).  The fact that a party may be served at any place in the country does not mean that every court has jurisdiction over the matter and venue is proper everywhere.  A court should take care to keep these distinctions in mind and be careful to note whether

-25-

Congress specifically was authorizing jurisdiction.  Willingway, 870 F. Supp. at 1107-1108.  Finally, "the subpoena power of a court cannot be more extensive than its jurisdiction."  487 U.S. 72, 74  U.S. Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 76, 108 S.Ct. 2268, 101 L.Ed.2d 69 (1988).

In the instant case, Section 512(h) says that the copyright owner or agent can seek a subpoena from any district court, but does not say that every district court has jurisdiction to issue a subpoena compelling action from persons outside of the district.  Without an explicit indication from Congress that such was the intention of the language, the Court will not infer it. The RIAA has pointed to nothing to convince the Court otherwise. Because of the potential for misuse, it is unlikely Congress would have granted such sweeping jurisdiction without discussion. Allowing private parties to use the power of federal courts to gather private information ex parte in absence of litigation or contemplated litigation (contrast Fed. R. Civ. P. 27) is an extraordinary event in itself without construing Section 512(h) as being a nationwide venue and jurisdiction statute.

The RIAA's fallback position is only slightly more reasonable.  It wants to use Fed. R. Civ. P. 45(b) to obtain a subpoena in this District, but for some reason, serve it in another nearby district.  Of course, it will limit its service to "100 miles of the place of the deposition, hearing, trial, production, or inspection specified in the subpoena."  Fed. R.

Civ. P. 45(b)(2). Those places necessarily must refer to places in the district which issued the subpoena.[8]

This position is equally unavailing. The language of Rule 45(b) directs where a subpoena may be served. It does not control who may issue the subpoena under the DMCA. The DMCA subpoena is a prelitigation subpoena. Rule 45 contemplates a court action or other proceeding which preexists, and serves as a basis for authorizing the issuance of a subpoena. It requires prior notice to adverse parties. Fed. R. Civ. P. 45(b)(1). The 100 mile provision of Rule 45(b)(2) only makes sense in that milieu. For that reason, the service provisions of Rule 45 do not authorize the service of the subpoena on N.C. State. For this additional reason, the subpoena shall be quashed.

Other issues have been raised concerning the constitutionality of the statute, as well as whether the DMCA conflicts with the privacy rights under the Family Education Rights and Privacy Act, 20 U.S.C. § 1232g(b)(2)(B). It is not necessary to address these issues.

**IT IS THEREFORE ORDERED** that John Doe's motion to quash (docket no. 6), and UNC's motion to quash (docket no. 29) in Case

---

[8]Were the language to be read otherwise, a party could set the place of production or inspection at any location throughout the country and then serve the subpoena within 100 miles of that place. Such a reading of Rule 45 would provide every district court with nationwide jurisdiction, venue, and service for its subpoenas. There is no indication in Rule 45 that such was intended.

In the instant case, the RIAA did not follow Rule 45(b)(2) because the subpoena dictated that the production would occur in Raleigh, not within this District.

No. 1:03MC138 are granted, and said subpoena be, and the same hereby is, quashed.

**IT IS FURTHER ORDERED** that Jane Doe's motion to quash and for a protective order (docket no. 2) and amended motion to quash (docket no. 18) in Case No. 1:03MC139 are granted, and said subpoena be, and the same hereby is, quashed.


_____
**United States Magistrate Judge**

April 14, 2005